1

2

3

4

5

6

7

8                              UNITED STATES  DISTRICT COURT

9                               Northern District of California

10                                San Francisco Division

11

12   MENTOR CAPITAL, INC.,                          No. 3:14-CV-3630 LB

13                        Plaintiff,
                                                    **ORDER COMPELLING**
14           v.                                     **ARBITRATION AND STAYING CASE**

15   BHANG CHOCOLATE CO., INC., BHANG               [Re:  ECF No. 18]
     CORPORATION, SCOTT VAN RIXEL,
16   RICHARD SELLERS, and WILLIAM
     WAGGONER

17                        Defendants.
     _____/
18

19                                  **INTRODUCTION**

20        This case arises from a soured commercial-investment contract.  The parties dispute neither the

21   existence nor the terms of that contract.  The contract has a clause providing that any party "may

22   demand" the arbitration of "any dispute" between the parties.  The court holds that, under that

23   clause, this case must be sent to arbitration.  The court therefore compels the parties to arbitrate this

24   dispute. The court stays this lawsuit pending the outcome of the arbitration, and retains jurisdiction

25   of this case to the limited extent that federal arbitration law permits it to do so.  The court finds this

26   matter suitable for disposition without a hearing under Civil Local Rule 7.1(b).

27

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1

**BACKGROUND**

2

Plaintiff Mentor Capital, Inc. and defendant Bhang Corporation (formerly known as Bhang

3

Chocolate Company, Inc.) entered into an investment contract.  Under that contract, Mentor was to

4

invest $39 million in Bhang.  The money was to be disbursed to Bhang in certain amounts according

5

to a certain schedule.  In return, among other things, Bhang would sell Mentor a 60% ownership

6

share in Bhang.  (ECF No. 18-1 at 5-13 (contract).)[1]

7

Defendants Scott Van Rixel is an owner and the CEO of Bhang; defendant William Waggoner is

8

also a Bhang owner.  (ECF 18-1 at 1-2 (¶¶ 1, 4).)  Mentor alleges that Van Rixel and Waggoner

9

were intended third-party beneficiaries of the Mentor-Bhang contract.  *See* (ECF No. 16 at 1 (¶ 1).)

10

The parties' contract has an arbitration clause whose relevant terms provide:

11

> This Agreement shall be governed and construed in accordance with the laws of

12

> the State of California . . . .  In the event that any dispute is unresolved after good
> faith attempts by the Parties, any Party may demand arbitration. In that case, the
> matter will be submitted to final and binding arbitration before an arbitrator of the

13

> American Arbitration Association. . . .  In the event [that] a Party brings any legal
> action or submits any claim or controversy to arbitration with respect to this

14

> Agreement, the prevailing Party, in addition to any other remedies available to it,
> shall be entitled to recover reasonable attorneys' fees and costs from the non-

15

> prevailing Party, regardless of whether such action, claim or controversy is
> prosecuted or arbitrated to completion.

16

17

(ECF 18-1 at 10.)  The parties do not dispute that they formed this contract. They do not dispute its

terms.

18

19

The agreement did not work out.  Mentor brought this suit for rescission; it claims, in short, that

Bhang "failed to perform its obligations under the . . . Agreement" by not adequately publicizing

20

Mentor's investment and by failing to give Mentor the requisite shares in Bhang.  *E.g.,* (ECF No. 19

21

at 7-8.)  Bhang responds that Mentor failed to make the required investment payments.  (ECF No. 26

22

at 8.)  Bhang has moved to compel arbitration.  (ECF No. 18.)

23

24

25

26

27

28

---

[1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

<div style="writing-mode: vertical">**UNITED STATES DISTRICT COURT**
For the Northern District of California</div>

1

**LEGAL STANDARDS**

2   The Federal Arbitration Act (FAA) establishes that contractual arbitration agreements must be

3   enforced "save upon such grounds as exist at law or in equity for the revocation of any contract."

4   *Newton v. Am. Debt Servs., Inc.*, 549 Fed. Appx. 692, 693 (9th Cir. 2013) (quoting 9 U.S.C. § 2).

5   The FAA reflects "both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle

6   that arbitration is a matter of contract.'"  *AT&T Mobility, LLC v. Concepcion*, 131 S.Ct. 1740, 1745

7   (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) and

8   *Rent-A-Center, West, Inc. v. Jackson*, 130 S.Ct. 2772, 2776 (2010)).  "In line with these principles,

9   courts must place arbitration agreements on an equal footing with other contracts, and enforce them

10  according to their terms."  *Concepcion*, 131 S.Ct. at 1745-46 (citing *Buckeye Check Cashing, Inc. v.

11  Cardegna*, 546 U.S. 440, 443 (2006) and *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland

12  Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

13  "[W]here a contract contains an arbitration clause," moreover, "courts apply a presumption in

14  favor of arbitrability . . . and the party resisting arbitration bears the burden of establishing that the

15  arbitration agreement is inapplicable."  *Wynn Resorts v. Atlantic-Pacific Capital, Inc.*, 497 Fed.

16  Appx. 740, 742 (9th Cir. 2012).

17  "Once the court has determined that an arbitration agreement relates to a transaction involving

18  interstate commerce, thereby falling under the FAA, the court's only role is to determine whether a

19  valid arbitration agreement exists and whether the scope of the dispute falls within that agreement."

20  *Ramirez v. Cintas Corp.*, No. C 04-00281 JSW, 2005 WL 2894628, at *3 (N.D. Cal. Nov. 2, 2005)

21  (citing 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir.

22  2000)).  The Ninth Circuit has emphasized a district court's limited role in this area:

23

24      The standard for demonstrating arbitrability is not high.  The Supreme Court has held that the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts direct the parties to proceed to arbitration on

25      issues as to which an arbitration agreement has been signed.  Such agreements are to be rigorously enforced.  Under § 4 of the FAA, ***the district court must order

26      arbitration if it is satisfied that the making of the agreement for arbitration is not in issue***.  Therefore, the district court can determine only whether a written arbitration

27      agreement exists, and if it does, enforce it in accordance with its terms.

28  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719-20 (9th Cir. 1999) (citations and footnote omitted)

(emphasis added).

The Supreme Court's decision in *Buckeye Check Cashing*, *supra*, sets three landmarks relevant to this case.  The Court there described three types of challenges that can be made to contracts calling for arbitration.  First, a party may deny that "an agreement . . . was ever concluded."  *See Buckeye Check Cashing*, 546 U.S. at 444 n. 1.  Where a party denies that it signed a contract, for example, or where a party "lacked the mental capacity to assent," the court may refuse to compel arbitration while it decides whether a contract was ever formed.  *See id.* at 444-45.  Second, a party may "challenge[] specifically the validity of the agreement to arbitrate."  *Id.* at 444.  In that case, too, "the federal court may proceed to adjudicate" the issue of whether the arbitration agreement was valid.  *See id.* at 444-45.  The third case is different.  Where a party "challenges the contract as a whole," but does not dispute that a contract "was ever concluded," the FAA "does not permit the federal court to consider" the party's challenge.  *Id.*  Challenges to the validity of the "entire contract" must be "referred to the arbitrators."  *See id.* (discussing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)).

## ANALYSIS

The operative facts of this case are largely undisputed.  Those facts allow the court to reach some key findings at the start of this analysis.  The parties do not dispute that they entered into a written contract. They do not dispute that their contract contained an arbitration clause.  They dispute none of the contract's terms, including those of the arbitration clause.

The parties do not dispute that their contract involves interstate commerce. Given the undisputed facts, moreover, the court finds that the contract does involve interstate commerce.  *See*, *e.g.*, 9 U.S.C. § 2; *Ramirez*, 2005 WL 2894628, at *3.  The parties' contract states that Bhang "is the world[-]leading brand of cannabis[-]related medicated chocolates."  (ECF No. 18-1 at 6.)  Bhang "has licensing agreements with various vendors separately in each of the states where legal cannabis sales are allowed, and internationally."  (*Id.* at 2 (¶ 6).)  Bhang "operates facilities in multiple states, serving people in those locations, utilizing interstate mail and travel systems."  (*Id.* at 2 (¶ 7).)  It "has a far-flung network of company resources, which it can and does access across state lines."  (*Id.* at 2 (¶ 8).)  Drawing upon recitations in the contract, Bhang alleges, and Mentor has not contested,

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  that Mentor agreed to invest in Bhang "to reap the benefits of Bhang's interstate business and

2  growth" as cannabis use "becomes legal" in "additional States." *See* (ECF No. 18-1 at 2 (¶ 12), 5-6.)

3  The contract thus sufficiently involves interstate commerce.

4      The court also holds that Mentor's rescission claim falls within the scope of the arbitration

5  clause. *See generally, e.g., Chiron*, 207 F.3d at 1130 (court must determine "whether [dispute] falls

6  within the scope of the parties' agreement to arbitrate").  Mentor makes a slightly cryptic argument

7  that this case does not "relate[] to the [Mentor-]Bhang Agreement" (ECF No. 19 at 25-26); but that

8  position is without merit.  The arbitration clause covers "any dispute" between the parties.  (ECF

9  No. 18-1 at 10.)  Any dispute.  Strictly speaking, this text does not even apply the usual limitation,

10  containing the arbitration clause to disputes arising out of this particular contract.  Assume that it is

11  so limited.  This lawsuit, Mentor's claim, alleges that Bhang "failed to perform its obligations"

12  under the contract and thus seeks "rescission of the . . . Agreement."  (ECF No. 19 at 7-9, 18, 22, 25-

13  26.)  It is beyond serious doubt that this constitutes a "dispute" between the parties that "relates to"

14  their contract.

15  **I.  THE ARBITRATION CLAUSE IS MANDATORY**

16      Mentor argues that the contract's arbitration clause is not mandatory.  Because it states that the

17  parties "may" demand arbitration, Mentor argues, the clause is "merely permissive."  (ECF No. 19 at

18  20.)  That clause does not mandate arbitration; it "merely" "clarifies" or "discusses" "one of two

19  paths that a party may follow to resolve a dispute."  (*E.g., id.* at 11.)  On this view, there is no

20  contract term under which Bhang can compel Mentor to arbitrate.

21      The court disagrees.  Once invoked, the contract's arbitration clause is mandatory.  That clause

22  states that, in the event of a dispute, any party "may demand" arbitration.  (ECF No. 18-1 at 6.)  If a

23  party makes that demand, "the matter *will be submitted* to final and binding arbitration . . . ."  (*Id.*

24  (emphasis added).)  All these terms — "may," "demand," and "will be submitted" — especially

25  when read together, yield a compulsory arbitration clause.

26      The parties focus on the word "may."  The court agrees with Bhang that, in this context, the

27  word "may" does not make the arbitration clause "merely permissive."  The word instead expresses

28  the grant of a contractual right to demand arbitration.  *Pacific Gas & Elec. Co. v. Superior Court*, 15

1   Cal. App. 4th 576, 595 (1993) ("In this context the 'may' signifies the right of the party to invoke

2   arbitration."); *see Serv. Employees Intern. Union, Local 18 v. Am. Bldg. Maint. Co.*, 29 Cal. App. 3d

3   356, 359 (1972) ("Among its many connotations, the word 'may' is sometimes used in granting . . .

4   parties a right, or privilege, with regard to the dispute.")).

5       The word "may" must furthermore be read in context.  It would be artificial, and partial, to focus

6   only on "may" when the term is "may *demand*."  What can "demand" mean here if not something

7   compulsory?  What would the right to "demand arbitration" amount to if the demand were merely

8   suggestive?  (The shared etymology of "demand" and "mandatory" — both words derive from the

9   Latin *mandare*, meaning "to order" or "to command"[2] — suggests something here.)  Read in its still

10  broader context, along with the phrase "will be submitted," the arbitration clause seems inescapably

11  mandatory.  If a party demands arbitration, then, under the arbitration clause's plain terms, "the

12  matter *will be submitted* to final and binding arbitration."  (ECF No. 18-1 at 6 (emphasis added).)

13      The court cannot accept that the term "may" means that the arbitration clause only "clarified"

14  and "discussed" the options available in case of an insoluble dispute — to arbitrate or sue.  *See* (ECF

15  No. 19 at 11-13.)  If this were the case, "the arbitration provision would serve little or no purpose."

16  *Pacific Gas*, 15 Cal. App. 4th at 595 (citing *Service Employees*, 29 Cal. App. 3d at 359).  This is "a

17  disfavored result under the canon that contracts should be construed so as to make them operative."

18  *Pacific Gas*, 15 Cal. App. 4th at 595.  As Mentor correctly writes: "Courts should construe [a]

19  contract[] to 'give effect to all its provisions' and to prevent any of the parties' negotiated terms

20  from becoming meaningless."  (ECF No. 19 at 12 (quoting *Mastrabuono v. Shearson Lehman*

21  *Hutton, Inc.*, 514 U.S. 52, 63 (1995)).  Heedful of that rule, and reading the parties' arbitration

22  clause to give all its terms effect, the court holds that, once invoked by a party's "demand," that

23  clause compels the parties to arbitrate "any dispute" they have under the contract.

24      Mentor makes two other arguments in this area.  Neither persuades. Mentor first argues, in

25  effect, that Bhang lost its right to arbitrate once Mentor sued.  Because Bhang did not demand

26  arbitration before Mentor sued, in other words, Bhang has no right to compel arbitration now.

27

28

---

[2] *See Barnhart's Concise Dictionary of Etymology* 454 (R. Barnhart ed., 1995).

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Indeed, Mentor goes as far as to say that there has been no demand for arbitration, "except, in a sort,

2    through . . . motion[] in this court."  (ECF No. 19 at 10-11.)  This argument is wanting.  It is more

3    than adequate to "demand" arbitration by motion after one's counterpart has sued under a contract.

4    That is a common occurrence: one party sues under a contract, and the other party moves to compel

5    arbitration.  The bulk of arbitration law owes its existence to parties following just that process.

6    Furthemore, nothing in the Mentor–Bhang contract suggests that the filing of a lawsuit by one party

7    forecloses the other party's right to "demand arbitration."  Mentor's argument in this respect is

8    unavailing.

9        Mentor also argues that arbitration cannot be compelled because the arbitration clause refers to

10   cost-shifting in both litigation and arbitration.  (ECF No. 19 at 12.)  This prevents the court from

11   denying Mentor the ability to litigate by compelling arbitration.  Mentor here refers to that part of

12   the arbitration clause that states,

13       In the event a Party brings any legal action or submits any claim or controversy to
         arbitration with respect to this Agreement, the prevailing Party . . . shall be entitled to
14       recover reasonable attorneys' fees and costs from the non-prevailing Party, regardless
         of whether such action, claim or controversy is prosecuted or arbitrated to
15       completion.

16   (*Id.*)  Because this refers to "legal action" and "prosecut[ion]," Mentor argues, arbitration cannot be

17   invoked to prevent Mentor from pursuing this suit.  (*See id.*)  The arbitration option cannot cut off

18   the litigation option.  This argument, too, is unconvincing.  The language in question is simply part

19   of a fee-shifting provision.  Nothing about the fee-shifting clause suggests that the filing of a lawsuit

20   by one party scotches the other party's right to demand arbitration.  That the fee-shifting term

21   addresses both litigation and arbitration speaks in no way to the compulsory (or "merely

22   permissive") nature of the arbitration option.  Furthermore, Mentor's interpretation would eviscerate

23   the right to demand arbitration.  It would make that right "meaningless."  *See Mastrabuono*, 514

24   U.S. at 63.  The court finds Mentor's construction too strained to accept.

25   **II.  MENTOR CHALLENGES THE ENTIRE CONTRACT — THE COURT MUST**

26        **THEREFORE COMPEL ARBITRATION**

27       A second discrete ground compels the court to send this case to arbitration.  Nowhere does

28   Mentor challenge the validity of the arbitration clause, specifically, as distinct from the entire

ORDER COMPELLING ARBITRATION (C 3:14-3630  LB)                    7

UNITED STATES DISTRICT COURT
For the Northern District of California

1   contract.  Rather, Mentor alleges that Bhang "failed to perform its obligations" under the contract as

2   a whole.  (ECF No. 19 at 7-9, 18, 22, 25-26.)  On this basis, as Mentor writes, "Mentor has claimed

3   rescission *of the entire Agreement* for failure of consideration."  (*Id.* at 23 (emphasis added).)

4          The court therefore must compel arbitration.  *Buckeye Check Cashing,* 546 U.S. at 444-46.  The

5   FAA "does not permit the federal court to consider" challenges to the validity of "the contract as a

6   whole."  *Id.* at 444.  (Except, again, insofar as a party claims that no contract "was ever concluded,"

7   *see id.* at 444 n. 1 — but that is not what Mentor argues.)  To this limited but crucial extent, *Buckeye*

8   *Check Cashing* serves as a controlling analogy.  Here, as in *Buckeye Check Cashing*, "[t]he crux of

9   the complaint is that the contract as a whole (including its arbitration provision) is . . . invalid."  *Id.*

10   at 444.  The court has no discretion to hear this challenge.  *Simula*, 175 F.3d at 719-20.  The case

11   must be "referred to the arbitrators."  *Buckeye Check Cashing,* 546 U.S. at 444-46.

12   **III.  MENTOR CONFUSES PRE- AND POST-FORMATION CONTRACTUAL**

13   **CHALLENGES — ITS RESCISSION CLAIM DOES NOT MEAN THAT NO**

14   **CONTRACT "WAS EVER CONCLUDED"**

15          A consistent error plagues Mentor's analysis.  Mentor repeatedly argues that it has "rescinded"

16   and thus "revoked" the agreement.  This means that the contract has been "extinguished." The court

17   must therefore return the parties to their original positions, as if they had never made a contract.

18   (ECF No. 19 at 9, 11, 15-24, 26); Cal. Civ. Code § 1688 ("extinguished").  This brings the case, on

19   Mentor's view, within that class of challenges that *Buckeye Check Cashing* recognized as

20   appropriately judicial rather than arbitral — and which would lead this court to deny arbitration.

21   This line of reasoning has at least two flaws.

22          First, Mentor mistakes in what sense a party may "rescind" an agreement under California law.

23   It is true that California's statutes speak of a party's "rescinding" a contract on certain grounds.  *See*

24   Cal Civ. Code § 1689(b) ("A party . . may rescind . . . .").  This does not change the fact that

25   rescission is ultimately a judicially granted remedy.  To effectively rescind a contract, a party must

26   sue and prove that it had the right to rescind on a legally recognized ground.  The court then unwinds

27   the contract and fashions relief that returns the parties to their original, pre-contractual position.

28   Mentor itself cannot fully "rescind" its contract.  *See Estate of Mesner*, 233 P.2d 551, 553 (Cal.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   1951) (Traynor, J.) (party "could not terminate their contract . . . by a notice of rescission, unless

2   they had the right to rescind.  Since there is no evidence that they had that right . . . ."); Cal. Civ.

3   Code § 1692 ("If an action . . . seeks relief based upon rescission *and the court determines that the*

4   *contract has not been rescinded . . . .*") (emphasis added).

5         In this vein — and presumably thinking of the FAA rule that arbitration clauses are enforced

6   "save upon such grounds as exist at law or in equity for the revocation of any contract" (9 U.S.C.

7   § 2) — Mentor repeats that it has "rescinded" the contract and asks: "What is revocation if not

8   rescission?"  (ECF No. 19 at 15, 21.)  The argument implicit in this question is not persuasive.  It

9   cannot be persuasive.  If Mentor's rhetorical query pointed to a sound argument for denying

10  arbitration, then every contract case in which a party sought rescission — and that is a great many

11  cases — could sidestep the FAA and evade arbitration.  A party could always duck a valid

12  arbitration agreement merely by seeking rescission.  That is not the state of arbitration law.

13        The second aspect of Mentor's mistake in this area is to confuse two different ways in which

14  contracts can fail.  On the one hand are cases in which a contract "was [n]ever concluded" —

15  because one party lacked the capacity to contract, for example, or because the promised

16  consideration was legally insufficient.  *See Buckeye Check Cashing*, 546 U.S. at 444-45 and n. 1.

17  Those are the cases in which courts may deny arbitration and decide judicially whether a valid

18  contract exists.  *See id.* at 444 n. 1.  On the other hand are those cases, perhaps more numerous, in

19  which validly formed contracts are later challenged for other reasons — because a party fails to keep

20  its promises, or because an illegal term in the contract warrants treating the compact as void *ab*

21  *initio*.  Challenges of the latter type cannot be addressed judicially in the face of a valid arbitration

22  agreement.  *See id.* at 444-46.

23        Mentor's challenge is of the latter sort.  Mentor conflates these two types of contractual failure

24  throughout its analysis but especially where it writes: "the Agreement is revoked and void *ab initio*

25  for lack of consideration."  *See* (ECF No. 19 at 18, 23.)  That is not really Mentor's claim.  At least

26  not in the deep sense in which the parties' contract can be deemed never to have been formed — so

27  that, under *Buckeye Check Cashing*, this court could retain this case.  Mentor does not allege in its

28  complaint, or argue in its brief, that the consideration promised in the parties' contract was legally

1   insufficient.  (The promised consideration *was* sufficient to support a contract.  Mentor promised to

2   invest $39 million in Bhang; and Bhang promised to give Mentor a share in its ownership.  (ECF

3   No. 18-1 at 5-13.))  What Mentor complains of is that Bhang "failed to perform its obligations"

4   under the contract.  (ECF No. 19 at 7-9, 18, 22, 25-26.)  It says that Bhang did not deliver the

5   promised consideration.  That is how the consideration (allegedly) "failed."  But that is a garden-

6   variety claim for breach of contact.  It is not the sort of pre-formation challenge that, under *Buckeye*

7   *Check Cashing*, the court can adjudicate in the face of the contract's arbitration clause.

8        This may be the best place to address one last argument that Mentor makes.  Mentor correctly

9   writes that the parties "agreed that California law was to apply" to any dispute they had.  (ECF No.

10   19 at 16.)  Under California law, where a contract is "illegal" or even just "rescinded," Mentor

11   argues, "arbitration would not be ordered or enforced."  (*Id.*)  Because Mentor "has rescinded" the

12   contract under California law, in other words, the court must deny arbitration.  (*Id.* at 16-17, 19-23.)

13        The Supreme Court rejected essentially the same argument in *Buckeye Check Cashing*.  The

14   plaintiffs there alleged that a check-cashing agreement "charged usurious interest rates" and

15   "violated various Florida lending and consumer-protection laws, rendering it criminal on its face."

16   *Buckeye Check Cashing*, 546 U.S. at 442-43.  The agreement contained an arbitration clause.  *Id.*

17   The trial court, and later the Florida Supreme Court, both refused to compel arbitration, "holding

18   that a court rather than an arbitrator should resolve a claim that a contract is illegal and void *ab*

19   *initio*."  *See id.* at 443.

20        The Supreme Court reversed.  The Court first set out the doctrinal scheme discussed earlier,

21   under which a court may not entertain post-formation challenges to the validity of a "contract as a

22   whole."  *See id.* at 444-45.  The Court then held that, even in state court, federal arbitration law

23   holds sway; consequently, the *Buckeye Check Cashing* rules could not be avoided by calling the

24   contract "illegal and void" under "Florida public policy and contract law."  *Id.* at 445-48.  This

25   refutes Mentor's argument about the parties' choice of California law.  It is federal arbitration law

26   that controls.  And, under that law, as the court hopes this opinion has adequately shown, the court

27   must compel arbitration.

28

<div style="writing-mode: vertical">UNITED STATES DISTRICT COURT
For the Northern District of California</div>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

The court grants Bhang's motion to compel arbitration.  The parties are ordered to submit this dispute to arbitration under the terms of their contract.  The court stays further proceedings in this lawsuit pending the results of arbitration.  The court retains jurisdiction of this case for those purposes for which federal arbitration law permits it do so.

**IT IS SO ORDERED.**

This disposes of ECF No. 18.

Dated: November 19, 2014



LAUREL BEELER
United States Magistrate Judge